## PRALL and others *vs.* TILT and others.

1. *Held*, in this suit for the recovery of five hundred and fifty-eight shares of stock, pledged as collateral security for credit, that the holders were *bona fide* purchasers of the stock, without notice, for valuable consideration, to the extent of the indebtedness to them. The stock to be re-assigned only upon payment of their debt and interest, with costs of this suit.

2. In this case, the stock was the property of a deceased testator, and the executrix had power, under the will, to make advances to two of the testator's sons, by whom the pledge was made, on the representation that the stock had been assigned to them under that provision, for advances, and they accordingly presented to the pledgees, the certificates of the stock and a letter of attorney to assign the stock in blank, executed by the executrix and delivered to them by her to be delivered to the pledgees in pursuance of the agreement for credit; *held*, that the possession of the certificates and the letter of attorney were, under the circumstances, corroborations of the representations, the inquiry as to the truth of which, the pledgees had no means of pursuing.

---

Bill for relief. On final hearing on pleadings and proofs.

*Mr. T. D. Hoxsey*, for complainants.

*Mr. Cortlandt Parker*, for B. B. Tilt and son.

THE CHANCELLOR.

The object of this suit is to recover from the defendants,. Benjamin B. Tilt and Albert Tilt, five hundred and fifty-eight shares of the capital stock of the Phœnix Manufacturing Company, a corporation under the laws of this state, located. at Paterson, which were assigned to them by an assignment executed by Rachel M. ,Prall, executrix of the last will and testament of Edwin T. Prall, deceased, in February, 1874.. The complainants are William Prall, one of the sons of Edwin T. Prall, deceased, and Margaret A. Campbell, one of the daughters of the latter, and Henry G. Campbell, her husband.. The defendants are Benjamin B. Tilt and Albert Tilt, Rachel M. Prall, the executrix, and Mortimer Prall and .Edwin T.. Prall, sons of the testator. All of the testator's children are beneficiaries under his will. In February, 1874, Mortimer· Prall and his brother Edwin, who were then in business together, under the firm of Prall Brothers, in the manufacture· of silk goods, needing capital or credit, offered to sell the stock in question to the Tilts, who were dealers in silk stock, under· the firm of B. B. Tilt and Son. They declined to purchase it,, but were willing to give, what is called in mercantile phrase,. a " line of credit " upon it as security, and it was accordingly agreed between the firms that the shares should be assigned to B. B. Tilt and Son as collateral security for silk stock to be sold by them to Prall Brothers, on credit, and that they would, on that security, give the latter a line of credit accordingly, to an amount equal to one-half of the par value of the stock. The stock then stood in the name of Edwin T. Prall, the testator. A letter of attorney, executed in blank by the executrix, authorizing the transfer of the stock, was delivered,. with the certificates of the stock, to B. B. Tilt and Son, in. pursuance of the agreement, and they having caused it to be· filled up, transferred the stock to themselves on the books of· the company. They subsequently sold to Prall Brothers,. goods on the security of the stock, and on the 1st of May,. 1875, at, or prior to which time, the dealings appear to have· ceased, the balance due to them for goods so sold was $9142.69,.

besides interest, which indebtedness is wholly unpaid. The par value of the stock was $27,900. It was inventoried by the executrix, as of the value of $11,160. As before stated, the stock, at the time of the agreement and consequent assignment to B. B. Tilt and Son, stood in the name of Edwin T. Prall, the testator. Of this fact, the Tilts had notice. They were both directors of the Phœnix Manufacturing Company, and the former was president. The letter of attorney was, as before stated, signed by Rachel M. Prall as executrix. She alone proved the will. Edwin T. Prall, the testator, by his will, after making certain provisions for his children, gave the balance of his estate, real and personal, to his wife, Rachel M. Prall, for and during her widowhood, and directed that in a certain contingency, which had happened when the agreement for the assignment of the stock as security was made, his executors might advance to each of his sons, Mortimer and Edwin, $10,000, to be charged to their respective shares of his estate, and should pay to each of them a certain annuity. He empowered his executors to sell any part or parts of his estate, real or personal, at public or private sale, and to re-invest the proceeds at discretion. It is alleged that when the transfer of the stock in question to B. B. Tilt was made, Mortimer and Edwin had not only received all the money to which, under the will, they were entitled in any event before the death of their mother, but that each of them was indebted to the estate for advances made by the executrix, to an amount exceeding his entire interest in remainder in the estate, so that each of them had, at that time, received from the estate, more than his share thereof in any event or contingency. The transfer of the stock to B. B. Tilt and Son, is said to have been made merely for the accommodation of Mortimer and Edwin, they and the executrix supposing that the latter had full power and authority so to dispose of the stock. It is alleged to have been, in fact, a fraud on the other children, legatees. The complainants insist that the Tilts should be decreed to deliver up the stock, as trust property misappropriated by the trustee. The Tilts had notice that the stock stood in

the name of the testator, but it does not appear that they were aware that the transfer to them was a misappropriation. No fraud appears in their conduct in the transaction. Edwin T. Prall, according to his own testimony, first approached them with an offer to sell the stock to them, and urged them to buy it. The object in selling it was alleged to be to raise capital for the business of Prall Brothers. They declined to buy. He then offered the stock to them as collateral security for credit, and the agreement to give credit upon it as collateral security was then made. Albert Tilt, between whom and Edwin T. Prall (Benjamin B. Tilt had retired from active participation in the business of his firm before that time,) the arrangement and agreement were made, testifies that he understood that the stock was the property of Prall Brothers, and had been acquired by them on account of their interest in the estate of their father, and that Edwin "so gave" him "to understand." It is true, that to the question, "Did you ever represent to Albert Tilt or Benjamin B. Tilt, or intend to represent, that this stock was the property of yourself and your mother, or either of you?" Edwin replied, "I never did;" but this ambiguous statement cannot outweigh the defendants' answer (which is full and responsive to the bill,) and the evidence of Albert Tilt. Besides, Albert Tilt was not sworn until after the giving of the above testimony by Edwin, and, although he testified that the statement made to him as to the ownership of the stock was made by Edwin, the latter was not called to contradict him. Moreover, the proposition in writing, made by Prall Brothers to the Tilts, is some evidence on this score. It is as follows : "We hereby offer to transfer to you 558 shares of the Phœnix Manufacturing Company, Paterson, N. J., as collateral security for credit to the amount of $14,000 on all bills of goods purchased by us from you to the above amount; also to give our promissory notes, at four months' time from the average date of said bills, to secure the payment of the same. If accepted, please send us receipt of stock and open our credit to the amount mentioned above, by sending an order for silk on the

Phœnix Manufacturing Company, Paterson, N. J." The certificates of the stock were, at the date of that paper, with the letter of attorney, in the possession of the Tilts, having been delivered to them by Prall Brothers in pursuance of the verbal agreement. The stock is not referred to, in that proposition, as the stock of the estate, but is treated as the property of Prall Brothers, and there is no pretence that there was any intention to conceal or misrepresent. There was, indeed, no reason or occasion for any concealment or misrepresentation. The executrix and Edwin both testify that they and Mortimer all thought that the executrix had the right to pledge the stock, and the Tilts had not, as yet, sold any goods on the faith of the transfer. Again, Edwin had been offering the stock for sale before the agreement was made. He offered it to Albert Tilt, and he had offered it to Mr. Green and to Mr. Ryle—to the latter at fifty cents on the dollar of its par value. The defence might rest on Edwin's representation that the stock was the property of himself and Mortimer, and the fact that Prall Brothers had possession of the certificates and a letter of attorney in blank, signed by the executrix, (who did not otherwise appear in the transaction,) given by her to them, with the certificates, to enable them to use and dispose of the stock as their own in the arrangement with the Tilts. That delivery of the certificates and letter of attorney was, under the circumstances, full corroboration of Edwin's statement to Albert Tilt. It was a representation, on her part, to the Tilts, that Prall Brothers were the lawful owners of the stock, and fully empowered to deal with and dispose of it accordingly. But, to go further, the Tilts had no actual notice of the contents of the will. If, under the circumstances, they were chargeable with constructive notice, such notice would have informed them that the executrix had power to dispose of the stock to change investments; that she had a life interest in it; that she had power to advance to Mortimer and Edwin each, $10,000, in a contingency which had happened, and that, in that contingency, they were also each entitled to an annuity out of the estate. The notice would by no means have con-

tradicted Edwin's statement to Albert Tilt, and the Tilts had
no means of pursuing the inquiry as to the truth of that
statement. It is argued, in behalf of the complainants, that
the fact that, at a meeting of the creditors of Meyenburg, Prall
& Co., of which firm Mortimer was then a member, in the fall
of 1873, the executrix was advised by her counsel not to
endorse, for the accommodation of that firm, their compo-
sition paper, was notice to the Tilts that Prall Brothers
were not the owners of the stock in question; but obvi-
ously it was not notice to them, if they or either of them
were present, (which is not clearly proved,) of the untruth
of the representation made months afterwards in regard
to an entirely different matter. It may be further re-
marked, in connection with the subject of notice, that it was
not until about a year after the transfer to the Tilts that
Mortimer and Edwin formally released the executrix from
the discretionary advances of $10,000 each, and the annuities
given to them in the will. It is alleged that, at the time of
the transfer, each of them was indebted to the estate in a sum
exceeding his entire interest in it, but the fact is not proved.
Edwin appears, according to his own testimony, to have been
indebted, at that time, for advances, to the amount of only
$7900, and it is said (though the evidence is by no means
clear on that point) that Mortimer was indebted to the amount
of $13,500, for money applied by him, without authority,
from the funds of the estate to the use of his firm of Meyen-
berg, Prall & Co. It is true that it is said that in 1875,
when Prall Brothers failed, the indebtedness of Mortimer to
the estate, for advances, was $18,604.70, and that of Edwin,
on the same account, was $20,576.88; but that was more
than a year after the transfer. Nor is it possible to say from
the evidence how these so-called advances should be regarded.
It does not appear whether they were loans or not. If they
were, they may have been secured. But however that may
be, the Tilts had no notice on the subject. It is evident that
the executrix continued to make advances to Mortimer and
Edwin after the transfer to the Tilts. Prall Brothers failed

in the spring of 1875. The bill in this cause was not filed until September following. Mrs. Campbell and William Prall were of full age at the time when the transfer to B. B. Tilt and Son was made. That firm, beyond all question, took the assignment in good faith. Edwin testifies that it was given to them in good faith. He says that the pledge, so far as he and Mortimer were concerned, was made in good faith, without suspicion that their mother had not the legal right to make it. She testifies to the same thing, and the Tilts both answer and testify to their own *bona fides* in the transaction, and their want of notice, and the absence of any suspicion on their part of any legal or equitable objection to it. On the faith of it they sold their goods on credit to Prall Brothers, and that firm are now indebted to them in the sum of about $10,000, for which they have no security except the stock. B. B. Tilt and Son have an unquestionable right to the life estate of the executrix in the stock. They have an unquestionable claim, also, to any interest, present or prospective, which Mortimer and Edwin may have in it. But, in my judgment, their right goes further. They stand before the court as *bona fide* purchasers without notice, for valuable consideration to the extent of their debt, and as such, they are entitled to the protection of equity. They will not be decreed to re-assign the stock, except on payment of the debt and interest for which it is security, with their costs of this suit.